## Mitchell v. Mitchell, Administrator, et al.

### (Decided October 7, 1924.)

## Appeal from Green Circuit Court.

1. Work and Labor—Law will Not Imply Promise to Pay for Personal Services Rendered as Between Persons Living Together as Matter of Mutual Convenience.—Where relationship of parties is such as to raise presumption that they lived together as matter of mutual convenience, law will not imply promise to pay for personal services rendered by one to other, but express contract must be proved, or it must be shown that both parties intended and expected that services were to be paid for, and stricter proof is required than in other cases.

2. Work and Labor—No Presumption that Services of Extraordinary Menial Kind are Gratuities.—There is no presumption that services of extraordinary and menial kind covering long period of years are gratuities, and strict proof of express contract is not required, but this does not apply to proof of services to one who was confined to his bed only at brief intervals, where services were only those usually performed during illness.

3. Work and Labor—Findings that Services of Son to Father were Not to be Paid for Sustained.—Evidence held to sustain findings that services rendered father by son were not intended to be paid for, but were result of plan adopted for mutual convenience.

MILBY & HENDERSON for appellant.

C. H. NOGGLE and JEFF HENRY for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

T. S. Mitchell, a resident of Green county, died intestate on October 10th, 1920. His only heirs at law were his children, J. S. Mitchell, Ermer Perry, Stella Gaddie, W. G. Mitchell, Bird Smith and R. D. Mitchell, who qualified as administrator, and brought suit for the settlement of the estate. W. G. Mitchell, who was made a party defendant, filed an answer setting up a claim of $4,170.00 for "caring for, seeing after, nursing and waiting on" the intestate from the 10th day of October, 1915, until the 10th day of October, 1920. The claim was contested and the case was referred to the master commissioner to report on claims and settle the accounts of the administrator. After hearing numerous witnesses the master commissioner filed a report rejecting the claim. W. G. Mitchell's exceptions to the report were overruled and the report confirmed. From that judgment this appeal is prosecuted.

The record discloses that T. S. Mitchell lived on a farm in Green county. His wife died about fourteen years prior to his death. A year or two after his wife's death his son, W. G. Mitchell, moved to his home and remained there until T. S. Mitchell's death. Another member of the household was Eliza Mitchell, a sister-in-law of T. S. Mitchell. Some time prior to the death of T. S. Mitchell, his children had moved away and established homes for themselves.

The evidence for W. G. Mitchell is in substance as follows: At the time of his mother's death he was living in another state and his father wrote to him to come and stay with him. Pursuant to this request he came and made his home with his father. Several years before his death, his father contracted Bright's disease, and during the last two or three years of his life was partially paralyzed. Several months before his death he could not move around without assistance, was unable to control his bowels and kidneys, and, occasionally, his mind was flighty. During these periods W. G. Mitchell was in constant attendance, and rendered services usually performed by a trained nurse. T. S. Mitchell stated to several witnesses that he didn't want Willis (W. G. Mitchell) to put in a tobacco crop, but wanted him to wait on him, and that he would give him more for waiting on him than the tobacco would be worth. To another witness he made substantially the same statement in regard to a wheat crop. To one witness he said: "Poor Willis, I intend that he shall have pay for waiting on me." He told another witness that he intended to pay Willis for his trouble in waiting on him. He said to another witness, in the presence of W. G. Mitchell, "I want to pay Willis for waiting on me, and for staying with me." To another witness he said that he did not want anybody there but Willis to wait on him, and that he expected to pay Willis for it. To still another witness he said he was going to pay Willis for staying there and waiting on him. It developed on cross-examination of W. G. Mitchell, who testified in rebuttal, that, with the exception of one time when his father was confined to his bed for about sixty days, he was never confined to his bed for a longer period than two weeks at a time.

On the other hand, the witnesses for appellees say that T. S. Mitchell was never incapacitated except for short periods at a time, and that during those periods other members of his family helped to wait on him. They

further say that W. G. Mitchell was dissipated, would get on frequent sprees, and that his father and Aunt Eliza spent more time waiting on him that he did on his father.

No rule is better settled than that where the relationship of the parties is such as to raise the presumption that they lived together as a matter of mutual convenience, the law will not imply a promise to pay for personal services rendered by one to another, but, on the contrary, an express contract must be proved, or it must be shown that at the time the services were rendered both parties intended, and expected, that the services were to be paid for, and in such cases stricter proof is required than in other cases. Sutherland v. Sutherland's Exors., 142 Ky. 688, 134 S. W. 1152; Bolling, etc. v. Bolling's Admr., 146 Ky. 313, 142 S. W. 387. The rule is conceded, but it is insisted that the case falls within the exception, that there is no presumption that services of an extraordinary and menial kind and covering a long period of years are a gratuity, and that strict proof of an express contract is not required, as announced in Humble v. Humble, 152 Ky. 160, 153 S. W. 249. Examination of that case will show that the intestate was confined to his bed for about five years. During all of that time he was not only unable to control his bowels and kidneys, but he suffered from syphilitic gangrene. It was frequently necessary to change his bed clothing, and bathe his body, and there was constant danger of infection. The services were performed by a daughter-in-law of the intestate, and it was impossible to find anyone else to perform the services. In the case at bar the intestate was not confined to his bed except at brief intervals. He was not suffering from a disease that was liable to cause infection, and the services alleged to have been performed by appellant were such as are usually performed during a long spell of illness.

But it is claimed that it was shown that the services were performed with the expectation, both on the part of T. S. Mitchell and W. G. Mitchell, that the latter should be paid therefor. In support of this position, attention is called to the undenied statements of T. S. Mitchell that he didn't want his son to raise a crop, but that he wanted him to wait on him, and that he expected to pay him therefor. In deciding cases of this kind courts are not confined to the evidence of statements made by the intestate, but may consider the conduct of the parties and all the circumstances surrounding them. Even if it be true

that T. S. Mitchell wrote to W. G. Mitchell to come to his home, it is clear that he did not do so for the purpose of procuring someone to wait on him, as he was then comparatively a young man and was not suffering from any physical disability whatever. While there was evidence that he said that he intended, or wanted, to pay W. G. Mitchell for his services, or that W. G. Mitchell ought to be paid, or that it would pay W. G. Mitchell better to wait on him than to raise a crop, the fact is that in his lifetime never did he pay W. G. Mitchell a single cent for his services, nor did he distribute his estate in such a way as to indicate that he felt bound to pay W. G. Mitchell for his alleged services. Giving due weight to these circumstances, as well as the circumstance that W. G. Mitchell was dissipated and needed the protection of a home, there are strong reasons for the conclusion that his life with his father and such services as he performed were the result of a plan adopted for their mutual convenience, rather than a contract for compensation, and we are unable to say that both the commissioner and the court erred in not reaching a contrary conclusion.

Judgment affirmed.